

**ATTORNEYS FOR APPELLANT**

Jenny R. Buchheit
Eileen P.H. Moore
Ice Miller LLP
Indianapolis, Indiana

**ATTORNEYS FOR APPELLEE**

Richard A. Kempf
Paul T. Deignan
Thomas F. O'Gara
Taft Stettinius & Hollister LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Champlain Capital Partners,
L.P.,

*Appellant (Defendant/Counterclaim
Plaintiff below)*

v.

Elway Company, LLP, Dale K.
Elrod, Jeffrey L. Elrod, and
Mary Ann Waymire,

*Appellees (Plaintiffs/Counterclaim
Defendants below)*

July 29, 2016

Court of Appeals Case No.
55A04-1510-CC-1630

Appeal from the Morgan Superior
Court

The Honorable Christopher L.
Burnham, Judge

Trial Court Cause No.
55D02-1105-CC-1032

**Bailey, Judge.**

# Case Summary

Champlain Capital Partners, L.P. ("Champlain") and Elway Company, L.P. ("Elway Company"), Dale K. Elrod ("Dale"), Jeffrey L. Elrod ("Jeffrey"), and Mary Ann Waymire ("Mary Ann") (collectively, "the Elrods"; taken together, the Elrods and the Elway Company shall be referred to as "the Elrod Plaintiffs") were engaged in litigation in which Champlain alleged that the Elrod Plaintiffs had breached a Bonding Collateral Agreement ("the Agreement") with Champlain, and that they had not acted in accordance with the Agreement's implied covenant of good faith and fair dealing. After a bench trial, the trial court found in favor of the Elrod Plaintiffs.

Champlain now appeals. We affirm in part, reverse in part, and remand with instructions.

# Issues

Champlain presents three issues for our review. We restate these as:

 I. Whether the trial court erred when it found that the Elrod Plaintiffs did not breach the Agreement although they did not provide $3.5 million in collateral to a bonding company;

 II. Whether the trial court erred when it did not find that the Elrod Plaintiffs had breached the Agreement although they did not reimburse Champlain when a portion of Champlain's collateral was used to pay bond claims; and

III.    Whether the trial court erred when it did not find that the Elrod Plaintiffs breached the Agreement's implied covenant of good faith and fair dealing.

# Facts and Procedural History

[4]     In 2004, the Elrods were majority shareholders in the John K. Elrod Company ("JKE"). JKE's business involved the construction of stadium seating, construction of racing safety barriers, and renting seating for large events. To bid on and perform many of the construction contracts, JKE needed to obtain performance bonds, payment bonds, and supply bonds to assure its customers, contractors, and subcontractors that work would be performed and paid for in the event JKE were to default on one or more of its contracts.

[5]     During 2004 and into 2005, the Elrods sought an investor that would be willing to acquire a majority interest in JKE. Champlain, an investment firm that focused on acquiring and growing small- and medium-size enterprises, eventually agreed to acquire JKE. A portion of Champlain's pool of funds for making investments came from the United States Small Business Administration ("SBA") and an associated agency, the Small Business Investment Company ("SBIC").

[6]     In 2005, Champlain acquired a majority interest in JKE through a leveraged buyout. The Elrods remained as minority shareholders. Dale and Jeffrey continued to serve as corporate officers in JKE, with Dale serving as a chief financial officer and Jeffrey serving as JKE's president.

[7] Both before the leveraged buyout and after it, JKE obtained its bonds from Safeco Surety ("Safeco").[1] Safeco's surety business focused on issuing construction and contractor bonds. To secure itself against losses in the event of claims against its construction bonds, Safeco required security from JKE. Prior to Champlain's acquisition of JKE, Safeco's security came in the form of personal indemnities from the Elrods. With Champlain's acquisition of JKE, Safeco's terms for continuing to issue bonds on JKE's behalf changed: rather than personal indemnities from the Elrods, Safeco demanded $3.5 million in collateral in the form of an irrevocable letter of credit ("ILOC" or "JKE ILOC"). The Elrods agreed to loan $3.5 million to JKE from the proceeds of the sale of the business to Champlain, with the loaned capital to be used to fund the ILOC. JKE's ILOC guarantying Safeco's collateral was placed with Fifth Third Bank.

[8] Shortly after Champlain acquired its majority interest in JKE, JKE encountered financial problems due to lost revenues when competitors unexpectedly underbid JKE for several contracts. JKE was also trying at this time to expand its business into larger jobs, and this effort required that JKE obtain an increase in its bonding limits from Safeco. In early 2006, JKE, acting through Dale and JKE's insurance agent, Ed Mournighan ("Mournighan"), sought to increase its bonding limits. After reviewing JKE's financial situation, which reflected a loss

---

[1] After the events at issue in this case, but before the instant litigation was initiated, Safeco was acquired by Liberty Mutual Insurance Company. For simplicity's sake, and because neither company is a party to the litigation, we refer to Safeco throughout.

for 2005 and significant debt on its balance sheet, Safeco indicated that it would not increase JKE's bonding capacity unless JKE provided additional security to Safeco in the form of either an additional $3.5 million in collateral, or an additional $2.5 million in collateral and personal indemnity guarantees from the Elrods.

[9] Champlain and the Elrods sought a source for the additional $3.5 million in collateral during the first half of 2006. Champlain was restricted from increasing its investment in JKE unilaterally because of conditions placed upon Champlain's use of investment funds from SBA and SBIC. In June 2006, after correspondence among Mournighan, Champlain, SBA, and Safeco, Champlain obtained approval from SBA and SBIC to use its capital to fund the additional $3.5 million in collateral for Safeco's bonding guaranty.

[10] Around this time, JKE's finances became even more unstable. Fifth Third Bank, which was JKE's senior lender as well as holding the ILOC that served as JKE's collateral for Safeco bonds, determined that JKE's financial situation violated covenants in loan agreements. Fifth Third Bank therefore moved JKE's loans to its workout division in anticipation of foreclosing on the loans; this would, both the Elrods and Champlain recognized, mean the end of JKE's business.

[11] To avoid this event, during July and August 2006 the Elrods, Champlain, JKE's lenders, and other minority shareholders in JKE negotiated a transaction that would restructure JKE's finances. In this transaction, the Elrods would

themselves contribute several million dollars in capital to JKE, and would ask Safeco to release the $3.5 million ILOC that JKE had posted using the Elrods' loan in 2005. The JKE ILOC would be replaced by a $3.5 million ILOC using capital from Champlain ("the substitute LOC"). The funding for the substitute LOC was to come from the capital SBA had agreed to permit Champlain to use as additional collateral to increase JKE's bonding limits with Safeco.

[12] Another facet of the recapitalization involved JKE selling to the Elway Company certain real estate and manufacturing assets that belonged to JKE. The Elway Company was to use funds from the Elrods to make this purchase, thereby contributing $4.7 million to JKE. (App'x at 640.) The Elway Company would, in turn, lease these assets back to JKE to allow JKE to continue to operate using the assets it had sold to the Elway Company. (App'x at 571-72.) Further, the Elrod Plaintiffs were to loan JKE an aggregate sum of $3.9 million; these funds were to be used to retire debt held by Fifth Third Bank. (App'x at 577.) In addition, JKE's other lenders ("the mezzanine lenders") were to agree to reduce the amount of their claims on the debts owed to them by JKE in exchange for additional shares of stock in JKE.

[13] Safeco agreed to release the funds from the JKE ILOC and to accept the substitute LOC. After Safeco released the funds, the various parties— Champlain, the Elrods, JKE's mezzanine debtors, and Fifth Third Bank— closed on the restructuring transaction on August 18, 2006.

[14] This set of transactions placed JKE on more solid financial footing, but did not address JKE's need to continue to expand its business to larger jobs. To expand, JKE still needed to increase its bonding limits with Safeco. Safeco, however, still required an additional $3.5 million in collateral before it would agree to increase the limits on the bonds it would issue on JKE's behalf. The restructuring of JKE meant that the $3.5 million that SBA had agreed to permit Champlain to use had already been placed into the substitute LOC.

[15] In an effort to ensure that collateral would be available so that Safeco would agree to increase JKE's bonding limits, the restructuring transaction included the Agreement between Champlain and the Elrods. The Agreement included provisions that required Champlain to provide a substitute LOC in a value "not to exceed $3.5 [m]illion," and for the Elrods to provide collateral "not to exceed $3.5 [m]illion" to Safeco. (App'x at 59.) By the time the Agreement and the other documents in the restructuring transaction were executed on August 18, 2006, Champlain had already provided Safeco with the substitute LOC. The Agreement set forth no time limit under which the Elrods were to provide Safeco with additional collateral.

[16] After the restructuring transaction had been finalized, Dale requested that Mournighan arrange a meeting with Safeco representatives concerning the requirement for additional collateral. A meeting occurred at the JKE home office on September 7, 2006. Dale and Mournighan attended the meeting, as did Dan Partin ("Partin") and Mike Ulrich ("Ulrich"), who were underwriters for Safeco assigned to JKE's account. During the meeting, Dale attempted to

negotiate a lower total collateral amount, arguing that Safeco should have confidence in the management team at JKE, that Safeco's exposure to liability on JKE bonds was at a low point and thus additional collateral was unnecessary, and that the removal of a significant amount of debt from JKE's balance sheet after the restructuring should allay Safeco's concerns about JKE's financial situation.

[17] Within a few days of the meeting, Safeco decided not only to decline JKE's request for an increase in its bonding limits, but also to decline to issue any new bonds of any type on JKE's behalf. Safeco's internal documents memorializing the decision addressed a number of reasons for this decision, including the "rather convoluted" restructuring transaction of August 2006, lack of profitability, lack of current tangible net worth, and JKE's budgeting practices in comparison to its income model. Safeco concluded that "[i]t is outside of our scope to support a regular bonding program given such volatility," and informed Mournighan that it would no longer underwrite JKE's bonds. (Ex. FFF.) Mournighan continued to try to persuade Safeco to continue to work with JKE, but was ultimately unsuccessful in his efforts and informed Dale of this on September 22, 2006. (Ex. DD.)

[18] In late September 2006, the Elrods put together a proposal for an additional restructuring transaction with Champlain that Dale believed would help further strengthen JKE. Champlain declined the offer in early October 2006, and tendered a counteroffer to the Elrods with an acceptance deadline of October 17, 2006. By this time, however, JKE's cash flow situation was dire, and it

defaulted on its lease payments to the Elway Corporation for the real estate and manufacturing assets. By October 10, 2006, it became clear to Jeffrey and others that JKE would be unable to continue operations, and that JKE might lack sufficient funds to pay its employees their wages.

[19] On October 11, 2006, Jeffrey informed JKE's employees that JKE was closing, and issued final paychecks. Dale and Jeffrey at this time resigned their employment positions at JKE and on JKE's board. Soon after this, the Elway Company, through Midwest Seating Corporation ("MSC"), which had been formed to handle the reacquisition of the Elway Company's leased assets from JKE, hired approximately two-dozen of JKE's former employees. MSC began the process of reacquiring from JKE the sold-and-leased-back assets, some of which were at JKE's Mooresville headquarters, and others of which were at job sites in different parts of the United States.

[20] On October 16, 2006, Champlain, acting as the majority owner of JKE, placed JKE into Chapter 7 liquidation bankruptcy in the United States Bankruptcy Court of Delaware. Mournighan learned of Champlain's decision through Dale; in turn, Mournighan informed Safeco of Champlain's decision to place JKE in bankruptcy. As a result, Safeco acted to draw down the funds in the substitute LOC. Safeco placed the $3.5 million into a bank account to use for paying claims against bonds Safeco had issued on JKE's behalf. Over the course of the ensuing years, Safeco used all but $591,023.98 of funds from the substitute LOC to reimburse itself for claims against JKE bonds and to

compensate itself for legal and other expenses associated with payment of bond claims and litigation concerning JKE's bonds. (App'x at 896.)

[21] As a result of the draw-down of Champlain's $3.5 million substitute LOC, Champlain demanded reimbursement from the Elrods under several provisions of the Agreement. The Elrods disputed Champlain's demands, insisting that they had no obligation to provide Champlain with any compensation associated with the substitute LOC funds.

[22] On December 22, 2010, the Elrod Plaintiffs filed a complaint seeking a declaratory judgment as to their obligations under the Agreement. The Elrod Plaintiffs alleged that their obligations under the Agreement were limited only to payments made from substitute LOC funds for defaults on performance bonds, that the Elrod Plaintiffs had no obligation to reimburse Champlain while there were still unsettled liabilities on performance bonds, and that Champlain had not adequately mitigated its damages.

[23] Champlain filed an answer and counterclaims in which it alleged that the Elrod Plaintiffs breached the terms of the Agreement when they did not post an additional $3.5 million in collateral and did not reimburse Champlain for funds Safeco drew down from the substitute LOC, that the Elrod Plaintiffs breached the Agreement's implied covenant of good faith and fair dealing, and that the Elrod Plaintiffs had been unjustly enriched. Amended complaints and counterclaims were filed; in its amended counterclaims, Champlain added a count seeking that the trial court reform the provisions of the Agreement so that

language related to performance bonds would also include payment bonds or all bonds.

[24] The parties filed motions for summary judgment, in which the Elrod Plaintiffs sought summary judgment that the Agreement applied only to performance bonds, and in which Champlain sought summary judgment on its breach of contract claim. The trial court granted the Elrod Plaintiffs' motion as to the applicability of the Agreement only to performance bonds, and denied Champlain's motion as to its breach of contract claim. The trial court also entered summary judgment as to Champlain's unjust enrichment claim, determining that because a contract governed the relationship between the parties, an unjust enrichment claim was not available to Champlain.

[25] On July 19, 2013, Champlain sought certification of the trial court's order for interlocutory appeal; the trial court granted certification, but this Court declined to hear the appeal. Back in the trial court, Champlain filed a motion for clarification of the trial court's summary judgment order. On December 29, 2014, the trial court issued an entry clarifying its order. In that order, the trial court concluded that it had disposed of both the unjust enrichment claim and, based upon its conclusion that the Agreement applied only to performance bonds, the request for reformation of the Agreement. This left only the questions of whether the Elrod Plaintiffs breached the Agreement when they did not post $3.5 million in collateral for Safeco and did not reimburse Champlain for Safeco's use of the substitute LOC funds for performance bond

claims, and whether the Elrod Plaintiffs had breached the implied warranty of good faith and fair dealing.

[26] A bench trial was conducted from June 30 to July 2, 2015. Prior to the trial, the Elrod Plaintiffs filed a request that the trial court enter its judgment in the form of written findings and conclusions.

[27] On September 15, 2015, after receiving proposed orders from both parties, the trial court entered its findings, conclusions, and judgment in the case. The trial court's judgment adopted verbatim, or nearly so, the proposed findings and conclusions tendered by the Elrod Plaintiffs. The trial court concluded that the Elrod Plaintiffs had not breached the Agreement either with respect to posting collateral or reimbursing Champlain for funds Safeco drew down from the substitute LOC, and had not breached the implied covenant of good faith and fair dealing. Accordingly, the court entered judgment entirely in favor of the Elrod Plaintiffs.

[28] This appeal ensued.

# Discussion and Decision

## Standard of Review

[29] Prior to trial, the Elrod Plaintiffs filed a written request for findings and conclusions from the trial court. Our standard of review in such cases is well settled. We apply a two-tiered standard of review:

First, we determine whether the evidence supports the findings and second, whether the findings support the judgment. In deference to the trial court's proximity to the issues, we disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment. We do not reweigh the evidence, but consider only the evidence favorable to the trial court's judgment. Challengers must establish that the trial court's findings are clearly erroneous. Findings are clearly erroneous when a review of the record leaves us firmly convinced a mistake has been made. However, while we defer substantially to findings of fact, we do not do so to conclusions of law. Additionally, a judgment is clearly erroneous under Indiana Trial Rule 52 if it relies on an incorrect legal standard. We evaluate questions of law de novo and owe no deference to a trial court's determination of such questions.

*Trabucco v. Trabucco*, 944 N.E.2d 544, 548-49 (Ind. Ct. App. 2011) (citations omitted), *trans. denied*. When a trial court has entered special findings on a party's request under Trial Rule 52(A), we may affirm the judgment on any legal theory the findings support. *Id.* at 549 (citing *Mitchell v. Mitchell*, 695 N.E.2d 920, 923 (Ind. 1998)). Before affirming on a legal theory not set forth by the trial court, "we should be confident that our conclusions are consistent with all of the trial court's findings of fact and the reasonable inferences flowing therefrom." *Id.*

[30] Here, the trial court adopted the Elrod Plaintiffs' proposed findings and conclusions. This Court does not encourage the verbatim adoption of a party's proposed findings and conclusions because of this practice's tendency to "leave[] us with a lower level of confidence that the findings reflect the independent judgment of the trial court." *Kitchell v. Franklin*, 26 N.E.3d 1050,

1058 (Ind. Ct. App. 2015), *trans. denied*. Such a practice is not prohibited, however, and "'the critical inquiry is whether such findings, as adopted by the court, are clearly erroneous.'" *Id.* (quoting *In re Marriage of Nickels*, 834 N.E.2d 1091, 1096 (Ind. Ct. App. 2005)).

## Choice of Law

[31] The Agreement includes a choice-of-law clause that provides, "This Agreement shall be governed under Delaware law." (App'x at 60.) None of the parties dispute that the Agreement itself should be interpreted under Delaware law. Accordingly, we apply Delaware law where appropriate to review the trial court's legal conclusions. *See Allen v. Great Am. Reserve Ins. Co.*, 766 N.E.2d 1157, 1162 (Ind. 2002) ("Indiana choice of law doctrine favors contractual stipulations as to governing law."). To the extent the parties dispute the applicability of Delaware or Indiana law with respect to Champlain's claim that the Elrod Plaintiffs breached the implied covenant of good faith and fair dealing, we shall address that dispute later in this opinion.

## Breach of Contract Claim: Posting Collateral

[32] We turn now to Champlain's first issue on appeal, whether the Elrod Plaintiffs breached the Agreement when they did not post $3.5 million in collateral to satisfy Safeco's request for additional collateral in exchange for increased bonding levels for JKE. Neither party disputes that the Elrod Plaintiffs did not post additional collateral. Rather, the question at trial was whether the Agreement required the Elrod Plaintiffs simply to tender $3.5 million in

collateral to Safeco, and whether Dale's decision to instead attempt to negotiate lower or no collateral with Safeco constituted a breach of the Agreement. Champlain challenges both the trial court's findings and its legal conclusions.

[33]    To the extent Champlain's arguments present questions of contractual construction, the Supreme Court of Delaware has stated:

> Delaware adheres to the "objective" theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party. We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage. We will not read a contract to render a provision or term meaningless or illusory. [A] contract must contain all material terms in order to be enforceable, and specific performance will only be granted when an agreement is clear and definite and a court does not need to supply essential contract terms.

> When the contract is clear and unambiguous, we will give effect to the plain-meaning of the contract's terms and provisions. On the contrary, when we may reasonably ascribe multiple and different interpretations to a contract, we will find that the contract is ambiguous. An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract.

> If a contract is ambiguous, we will apply the doctrine of *contra proferentem* against the drafting party and interpret the contract in favor of the non-drafting party. The parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous. The determination of ambiguity lies within the sole province of the court.

*Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159-60 (Del. 2010) (citations, quotations, and notes omitted).

## Challenges to the Findings

[34] Champlain contends that the trial court's finding that Safeco would not accept collateral from the Elrod Plaintiffs before September 7, 2006 was in error, and that in any case the finding is irrelevant because "the Elrod Plaintiffs were contractually obligated to make [the funds for the collateral] available for the benefit of both JKE and Champlain." (Champlain's Br. at 28 n.13.)

[35] The trial court here found that there was "no evidence indicating that Safeco's decision not to provide future bonding to JKE was related in any way to [the Elrod Plaintiffs'] alleged failure to post collateral in a particular form or certain amount." (App'x at 33.) Rather, the trial court concluded that no breach had occurred because Dale took action to meet with Safeco, provided Safeco with updated financial information concerning JKE for Safeco's due diligence process, provided Safeco with his and Jeffrey's personal financial statements, and negotiated with Safeco over a collateral commitment for higher bonding levels for JKE. Moreover, the trial court found that "Safeco would not take any additional collateral from [the Elrod Plaintiffs] to support a future bonding program," and thus the Elrod Plaintiffs did not breach the Agreement by "failing to provide Safeco something it never requested from them" after determining to terminate its business relationship with JKE. (App'x at 33.)

The evidence introduced at trial, taken together with inferences favoring the judgment, does not invariably establish the contrary of the trial court's finding that "Safeco would not 'take' any collateral." (Champlain's Br. at 28.) Arguing that the court's finding is in error, Champlain directs us to evidence that indicates that Safeco reiterated its requirement for additional collateral at numerous points in 2006, and that, during a deposition in a bankruptcy case, Ulrich testified that had Dale come to the September 7, 2006 meeting with $3.5 million in collateral ready, Safeco would have continued to underwrite JKE's bonds. However, the last of Safeco's requests for additional collateral came in June 2006, two months prior to the restructuring transaction in August 2006. Further, the trial court was entitled to weigh against Ulrich's deposition testimony during the bankruptcy proceedings his testimony at the trial in this case that 1) Safeco would not provide additional underwriting without going through a due diligence process involving JKE's financial situation, and 2) after the September 7, 2006 meeting, Safeco would no longer accept any collateral from the Elrod Plaintiffs to support JKE's bonding needs.

Taken together, the trial court could properly infer that Safeco would not simply exchange collateral for a bonding program without at least some additional inquiry. To the extent Champlain emphasizes some portions of the record over others to which the trial court gave more weight, the argument amounts to an invitation to reweigh evidence that we must decline. We accordingly find no clear error in the trial court's conclusion that there was no

request from Safeco for collateral that in turn required the Elrod Plaintiffs to post collateral at the time of or after the August 2006 restructuring.

## Time for and Amount of Performance

[38] Nor do we think the language of the Agreement required the Elrod Plaintiffs to simply part with $3.5 million in the manner Champlain suggests in its brief. The Agreement provides:

> In addition to the Substitute LOC, Safeco is requiring additional collateral be made available in connection with its continued underwriting and issuance of performance bonds for JKE Bonded Projects. To that end, [the Elrod Plaintiffs] have agreed … to provide, as additional collateral to Safeco, the Elrod/Elway Guaranty up to an aggregate amount not to exceed $3.5 Million.

(App'x at 59.) Champlain argues that this provision, together with a precatory statement earlier in the Agreement, required the Elrod Plaintiffs to provide $3.5 million to Safeco no later than the time of the September 7, 2006 meeting.

[39] Yet the Agreement does not demand this result. The precatory clause upon which Champlain relies states that JKE had "requested" of the Elrod Plaintiffs (which request the Elrod Plaintiffs had agreed to) a commitment to

> support JKE's ongoing bonding requirements by collateralizing performance bonds issued and to be issued by Safeco or another bonding company acceptable to the parties of up to $3.5 Million by issuing a guarantee of up to $3.5 Million or other collateral acceptable to Safeco or such other bonding company acceptable to the parties…

(App'x at 58.) With respect to the Elrod Plaintiffs' actions, the Agreement provided that the Elrod Plaintiffs had agreed to provide a guaranty of "up to an aggregate amount not to exceed $3.5 Million." (App'x at 59.) In exchange for providing the guarantee, the Elrod Plaintiffs were entitled to "be paid a cash fee by JKE … in an annual amount equal to 3% of the face amount thereof payable in four equal quarterly installments, commencing the first day of the month after the effective date of the [guaranty]," with JKE's payment obligation to endure so long as the guaranty remained outstanding. (App'x at 59.)

[40] There is, however, no language in the Agreement that specifies a time limit for tender of the Elrod/Elway Guaranty. "If no time for performance is fixed, the court will imply a reasonable time." *Martin v. Star Pub. Co.*, 126 A.2d 238, 244 (Del. 1956); *Comet Sys. Inc. S'holders' Agent v. MIVA, Inc.*, 980 A.2d 1024, 1035 (Del. Ch. 2008). Champlain argues that the longest reasonable period of time the Elrod Plaintiffs could have delayed posting collateral for Safeco's use ran from August 18 to September 7, and points to its own posting of collateral for the substitute LOC prior to the August 18, 2006 restructuring transaction. Champlain's position, then, is that the Elrod Plaintiffs should have walked into the meeting with Safeco with $3.5 million in collateral in hand and tendered that collateral to Safeco, and that the trial court erred when it did not construe the Agreement to include such a provision requiring at least that the Elrod Plaintiffs provide *some* amount of collateral by that time.

[41] We cannot conclude that Champlain has carried its burden on appeal to demonstrate that the trial court erred when it did not adopt Champlain's

argument that September 7, 2006 was the last reasonable date on which the Elrod Plaintiffs could have performed their obligations under the Agreement. The Agreement's own terms appear to contemplate that Safeco might request a different amount or form of collateral than $3.5 million in the form of cash or a letter of credit. The use of terms such as "up to $3.5 Million" and "other collateral acceptable to Safeco," and the Agreement's provision of a 3% fee based upon the amount of collateral provided all indicate that the parties understood the $3.5 million amount to be subject to some variation. At one point during 2006, Safeco had offered alternatives of either $3.5 million cash collateral or $2.5 million cash collateral and personal indemnities from Dale, Jeffrey, and Mary Ann. The amount of collateral, and the time at which it was to be provided, was subject to determination by Safeco. Champlain has not established that the trial court erred when it reached such a conclusion.[2]

## Effect of the Priority Provision

[42]    Champlain also argues that the Elrod Plaintiffs were required to provide $3.5 million up front based upon the following provision ("the Priority Provision"):

> Notwithstanding any documentation to the contrary between
> Safeco and [Champlain or] Safeco and [the Elrod Plaintiffs], in
> the event that Safeco releases, refunds or reduces its requirement

---

[2] Champlain suggests that the trial court improperly used the doctrine of commercial frustration, as set forth by Delaware courts, to excuse the Elrod Plaintiffs' performance. Because we conclude that the terms of the Agreement did not in themselves give rise to a specific moment or amount of money that would constitute performance, the question of excuse as a result of commercial frustration is obviated. We accordingly do not address Champlain's argument related to this doctrine.

of an aggregate $7 Million collateral commitment … the parties agree as follows:

1.      Any release, refund or reduction of the $7 Million aggregate collateral commitment required by Safeco will first inure to the benefit of Champlain in the form of a reimbursement, on a dollar-for-dollar basis, of cash collateral made available by Champlain to the issuer of the Substitute LOC … in an amount not to exceed $3.5 Million in recognition of the out-of-pocket cash collateral provided by Champlain in arranging the Substitute LOC.

(App'x at 60.)

[43] Champlain contends that the Priority Provision requires that the Elrod Plaintiffs were obligated under the Agreement to reimburse Champlain for the funding of the substitute LOC, because Safeco refused any further dealings with JKE. Yet the Priority Provision does not in any manner consider that Safeco would *terminate* dealings with JKE—rather, it contemplates that Safeco would accept $7 million total collateral, and that Champlain would be the first to benefit from any subsequent reduction of the $7 million total. There is, in fact, no provision anywhere in the Agreement for the possibility that Safeco would simply refuse to continue issuing bonds for JKE.

[44] In light of that omission, we are left to resolve an ambiguity in the Agreement.

If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity. But when there is uncertainty in the meaning and application of contract language, the

> reviewing court must consider the evidence offered in order to arrive at a proper interpretation of contractual terms.

*GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 783-84 (Del. 2012). Further, "Delaware law tends to disfavor" forfeiture. *Hillman v. Hillman*, 910 A.2d 262, 271 (Del. Ch. 2006).

[45] The Agreement here is tied closely to the purpose of the broader August 18 restructuring of JKE's finances, of which the Agreement was one part. The purpose of the transaction as a whole was to recapitalize JKE in order to put the business on sounder financial footing. This was to happen largely through contributions of capital, retirement of debt, and the sale and lease-back of JKE's assets. To obtain capital with which to retire the debt owed to Fifth Third Bank, the parties agreed that Champlain would contribute $3.5 million for the substitute LOC, which would replace the $3.5 million ILOC. The ILOC funds had come from the Elrod Plaintiffs' proceeds from Champlain's leveraged buyout of JKE. Replacing the ILOC with the substitute LOC and returning the money to the Elrod Plaintiffs permitted the Elrod Plaintiffs to use the returned $3.5 million to invest in JKE. The Elrod Plaintiffs did so.

[46] The Agreement set forth terms under which the Elrod Plaintiffs would contribute up to $3.5 million in collateral for additional bonding capacity. The Agreement contemplates that the parties might agree to do business with a bonding company other than Safeco—but makes no provision for the situation in which *no* bonding support could be found. Yet precisely this contingency

came to pass: Mournighan could locate no bonding support for JKE before its bankruptcy in October 2006.

[47]     In the background of the Agreement, then, is an apparent assumption that Safeco's underwriting requirements—or at the very least its willingness to issue bonds on JKE's behalf—would not change. During much of 2006, Safeco had stated that JKE would need to provide a total of $7 million in collateral to increase its bonding capacity; to keep the business's existing bonding capacity, JKE would need only $3.5 million in collateral. The parties went through the process of obtaining permission from SBA and SBIC to use $3.5 million from Champlain to post collateral that was initially intended to induce Safeco to increase JKE's bonding limits. Those funds were instead used to replace the ILOC with the substitute LOC. It thus appears that, at least to keep JKE operating, the parties intended to keep Champlain's $3.5 million substitute LOC in place and to *add* the Elrod Plaintiffs' funds to that amount—premised upon the unstated assumption that Safeco was willing to continue to underwrite the bonds.

[48]     Given the ambiguity in the Agreement, and in light of the intent of the parties as manifested by the entirety of the August 18 restructuring transaction, we conclude that the Agreement required that the Elrod Plaintiffs add to the bonding collateral only upon Safeco's demand. The Agreement did not by its terms require the Elrod Plaintiffs to make $3.5 million available to Champlain or JKE. Nor did the Agreement provide that Safeco's refusal to continue to underwrite JKE's bonds amounted to a reduction of collateral that would first

inure to Champlain's benefit or otherwise require that the Elrod Plaintiffs replace the substitute LOC with a $3.5 million contribution of their own. We therefore cannot conclude that the trial court erred when it did not find that Elrod Plaintiffs breached by not making $3.5 million available to Safeco, JKE, or Champlain.

[49] Finally, Champlain contends that the Elrod Plaintiffs—specifically, Dale—actively attempted to avoid contractual obligations to Champlain's detriment, and that the trial court erred when it did not find that Dale's conduct constituted a breach. Specifically, Champlain contends that Dale's efforts to negotiate with Safeco, rather than simply to offer Safeco $3.5 million in collateral, amounted to a breach of the Agreement. This, again, relies on an interpretation of the Agreement that required the Elrod Plaintiffs to provide, unconditionally, $3.5 million to Safeco (or, presumably, to Champlain or JKE). The Agreement does not provide this by its terms, and we decline to find error in the trial court's conclusion that Dale's efforts to negotiate with Safeco were not a breach of contract.[3]

---

[3] Champlain also argues that Dale's conduct, if not a breach of the express terms of the Agreement, was at least a breach of the implied covenant of good faith and fair dealing. We address this issue below.

# Breach of Contract:  Reimbursement

## Whether the Agreement Established a Reimbursement Obligation

[50]  We turn now to Champlain's other breach of contract claim:  whether the Elrod Plaintiffs breached the terms of the Agreement when they refused to reimburse Champlain for the substitute LOC funds that Safeco used to pay claims on JKE's bonds.

[51]  The provision of the Agreement at issue ("the Reimbursement Provision") states:

> Notwithstanding any documentation to the contrary setting forth the legal effect, rights, obligations, and priority of Safeco as against (i) Champlain under the Substitute LOC and (ii) [the Elrod Plaintiffs] under the Elrod/Elway Guaranty, but subject to section D.2 below, both Champlain and [the Elrod Plaintiffs] agree that they will share and incur ultimate liability and financial out-of-pocket exposure to Safeco on a *pro rata* and *pari passu* basis with respect to the $7 Million aggregate Safeco Collateral Commitment, which is being made under the Substitute LOC and the Elrod/Elway Guaranty.

(App'x at 59.)

[52]  Champlain argues on appeal that the trial court erred when it concluded that Champlain was not entitled to reimbursement of half the value of the substitute LOC under the Reimbursement Provision.  In reaching its conclusion, the trial court construed the Reimbursement Provision together with portions of Section D of the Agreement so as to unequally allocate the risk of loss.  Section D

provided broadly for allocation of risk between Champlain and the Elrod Plaintiffs in the event Safeco drew upon Champlain's substitute LOC to pay for claims against JKE bonds, with language relating specifically to performance bonds:

> In the event that (i) any JKE performance bond is in default, terminated or otherwise called in connection with a Bonded Project and (ii) results in Safeco drawing down on the Substitute LOC ("an LOC Draw") as permitted under the Substitute LOC arranged by Champlain, the parties agree as follows:
>
> ***
>
> 2.      To the extent that an LOC Draw does not result in a commensurate and concurrent request from Safeco for [the Elrod Plaintiffs] to fund under the Elrod/Elway Guaranty, [the Elrod Plaintiffs] will reimburse Champlain fifty percent (50%) of any and all amounts drawn down under the Substitute LOC so as to reduce Champlain's out-of-pocket liability and to ensure that Champlain and the Elrod/Elway exposure under their Collateral Commitment is *pro rata* and *pari passu*[4]…

(App'x at 59-60.)

[53]    Champlain contends that the trial court erred in its construction of the Reimbursement Provision and Section D.  The trial court determined that *pro rata* and *pari passu* compensation was to be determined relative to how much

---

[4] *Pro rata* terms require proportional allocation, "according to an exact rate, measure, or interest." *Black's Law Dictionary* 1415 (10th ed. 2014). *Pari passu* terms require proportionality of pace, that is, compensation "without preference." *Id.* at 1290.

collateral the two parties—Champlain and the Elrod Plaintiffs—had contributed. The Elrod Plaintiffs ultimately did not provide any collateral under the Agreement. The trial court concluded that this meant that the Elrod Plaintiffs had no obligation to provide any reimbursement to Champlain:

> Because Safeco refused to provide additional bonding and take any collateral from the Elrods (and because no other surety company could be found to do so before JKE filed for bankruptcy), the resulting zero percent *pro rata* allocation attributable to the Elrods under [the Agreement] indicates that [the Elrod Plaintiffs have] no liability to Champlain under the *pro rata* and *pari passu* liability sharing provisions of Section D.2 or of Section C [the Reimbursement Provision].

(App'x at at 34.) The trial court rejected Champlain's "continued insistence" that "'*pro rata* and *pari passu*' means 50-50." (App'x at 34.) In their brief, the Elrod Plaintiffs agree with the trial court, and argue that the phrase, "$7 Million aggregate Safeco Collateral Commitment" means that they would only have incurred liability under the Agreement once the $3.5 million threshold had been passed.

[54] Reading the Agreement as a whole, we think Champlain is correct that the trial court's construction of the terms of the Reimbursement Provision and Section D was erroneous. The Agreement provided that, "[n]otwithstanding" any contrary agreements with Safeco, and "subject to [the provisions of] section D.2," Champlain and the Elrod Plaintiffs would share liability on the $7 million aggregate collateral commitment to Safeco on a "*pro rata* and *pari passu*" basis. (App'x at 59.) Section D.2, in turn, addressed a possible situation where Safeco

would *not* seek compensation from any collateral posted by the Elrod Plaintiffs. In that case, the Agreement called for the Elrod Plaintiffs to reimburse Champlain for half of "any and all amounts drawn down under the Substitute LOC." (App'x at 59.) This provision, properly construed, should have operated to ensure that exposure to risk of loss on a commitment of collateral would be shared equally—*pro rata*—and without preference with respect to payment—*pari passu*.

[55] Thus, Section D.2 covers a number of situations in which Safeco either might accept collateral from the Elrod Plaintiffs but would not then draw upon that collateral in the event of a bond default, or would not require the Elrod Plaintiffs to provide collateral at all—conceivably by requiring personal indemnities from Dale, Jeffrey, and Mary Ann without any corresponding cash collateral, which had been Safeco's form of security prior to Champlain's leveraged buyout of JKE. In either of those situations, Safeco might have drawn only upon the substitute LOC and, by the terms of the Agreement, the Elrod Plaintiffs would have been required to reimburse Champlain one-half of the amount drawn down from the substitute LOC by Safeco.

[56] Accordingly, we conclude that Section D.2 established an obligation on the Elrod Plaintiffs' part to reimburse Champlain in the event Safeco drew down funds from the substitute LOC, with that obligation subject to other conditions that we discuss below. The language of the Agreement reflects the parties' intent, as part of the broader scheme of the August 18 restructuring, to ensure that the risk of loss of funds to Safeco bond claims would not rest solely with

Champlain. The agreement evinces that this was the parties' intent even in situations when the Elrod Plaintiffs did not provide any collateral for Safeco's security.

[57] Perhaps recognizing this difficulty, the Elrod Plaintiffs insist that the "$7 Million aggregate Safeco Collateral Commitment" amounts to a condition precedent. They argue that without a requirement from Safeco that the aggregate collateral for bonds issued on JKE's behalf exceed $3.5 million, no obligation arose to reimburse Champlain for funds drawn from the substitute LOC. We disagree. "A condition precedent is '[a]n act or event, other than a lapse of time, that must exist or occur before a duty to perform something promised arises.'" *AES Puerto Rico, L.P. v. Alstom Power, Inc.*, 429 F. Supp. 2d 713, 717 (N.D. Del. 2006) (quoting *Seaford Assocs. Ltd. P'ship v. Subway Real Estate Corp.*, 2003 WL 21254847, at *5 n.30 (Del. Ch. May 21, 2003)). Where the language of a contract is clear and unambiguous in establishing a condition precedent, the court must give that language its plain meaning. *Commonwealth Const. Co. v. Cornerstone Fellowship Baptist Church, Inc.*, 2006 WL 2567916, at *21 (Del. Super. Ct. Aug. 31, 2006). However, "[c]onditions precedent are not favored in contract interpretation because of their tendency to work a forfeiture." *Stoltz Realty Co. v. Paul*, 1995 WL 654152, at *9 (Del. Super. Ct. Sept. 20, 1995) (citing 17A Am. Jur. 2d *Contracts* § 471 (1991)). Delaware law has adopted the approach of the Restatement (Second) of Contracts, which provides:

> In resolving doubts as to whether an event is made a condition of an obligor's duty … an interpretation is preferred that will reduce the obligee's risk of forfeiture, *unless the event is within the obligee's control* or the circumstances indicate that he has assumed the risk.

*McAnulla Elect. Const., Inc. v. Radius Techs., LLC*, 2010 WL 3792129, at *6 (Del. Super. Ct. Sept. 24, 2010) (quoting Restatement (Second) of Contracts § 227(1)) (emphasis added).

[58] The "$7 Million aggregate Safeco Collateral Commitment" language does not unambiguously give rise to a condition precedent. As with other provisions in the Agreement, the language expresses the parties' assumption as to the amount of collateral Safeco would require to expand JKE's bonding limits and as to Safeco's continued willingness to provide bonding support. An assumption does not, however, amount to a condition precedent. Holding otherwise would put Champlain in the position of having to satisfy a condition precedent that could be satisfied *only by the Elrod Plaintiffs*: the contribution of additional capital to reach the $7 million aggregate amount of collateral. *See McAnulla*, *supra.* Contract principles militate against such an outcome, and we therefore find no condition precedent.

[59] In that light, we cannot conclude that the trial court's construction of the Reimbursement Provision and Section D.2 was correct. By the Agreement's terms, Champlain and the Elrod Plaintiffs clearly contemplated the sharing of risk associated with the cost of LOC draw-downs from the substitute LOC, whether or not the Elrod Plaintiffs had contributed bonding collateral.

# The Extent of the Reimbursement Obligation

[60] Having determined that the trial court erred in concluding that Champlain was not entitled to reimbursement unless the Elrod Plaintiffs had also contributed collateral, we turn now to whether the Agreement requires under the circumstances of this case that Champlain receive reimbursement and, if so, how much. This question takes on two dimensions. The Elrod Plaintiffs argue that even if the Agreement's reimbursement provisions require payments to Champlain, nevertheless Champlain failed to meet prerequisites for reimbursement on certain projects. For its part, Champlain argues that it is entitled to $1.75 million from the Elrod Plaintiffs under the Reimbursement Provision; failing that, Champlain argues in the alternative that it is entitled to either: reimbursement of 50% of the amounts drawn down by Safeco from the substitute LOC or, at the very least, 50% of the amounts drawn down related to two specific projects.

[61] The parties disagree as to whether the Reimbursement Provision works independently, or in conjunction with Section D.2. The first of the Elrod Plaintiffs' two contentions—that Champlain was required to prove that projects subject to bond claims had been completed before any reimbursement obligation arose—construes the Reimbursement Provision together with Section D.2. Champlain contends that the Elrod Plaintiffs' interpretation of Section D.2 is incorrect because the Reimbursement Provision operates independently of Section D.2. Thus, Champlain argues, it was entitled to half of the total amount of the substitute LOC.

[62]     We disagree with Champlain's construction of the Reimbursement Provision apart from Section D.2. The text of the Reimbursement Provision specifically provides that both Champlain and the Elrod Plaintiffs, "*subject to section D.2 below … agree that they will share and incur ultimate liability and financial out-of-pocket exposure to Safeco.*" (App'x at 59.) (emphasis added) The provision is unambiguous: to obtain reimbursement from the Elrod Plaintiffs, the provisions of Section D.2 must also be satisfied. We accordingly disagree with Champlain's assertion, resting solely on the language of the Reimbursement Provision, that it is entitled to a blanket reimbursement of 50% of the total Safeco draw-down from the substitute LOC solely because a draw-down occurred.[5]

[63]     Having determined that the Elrod Plaintiffs' reimbursement obligations are subject to the provisions of Section D.2, and having previously rejected the trial court's construction of the Reimbursement Provision and of Section D.2, we turn to the relevant portion of the Agreement. The parties dispute the proper interpretation of the following language:

> To the extent that an LOC Draw does not result in a commensurate and concurrent request from Safeco for the Elrods and/or Elway to fund under the Elrod/Elway Guaranty, the Elrods and/or Elway (as applicable) will reimburse Champlain fifty percent (50%) of any and all amounts drawn down …

---

[5] We note as well that Champlain's interpretation might result in some amount of a double recovery for Champlain, since nearly $600,000 remained of the substitute LOC funds drawn down by Safeco, and a Safeco representative testified at trial that, once all legal proceedings were concluded, an accounting and final reimbursement to Champlain of the remaining collateral might be possible.

according to the following procedure: (a) if at any time, there is only one Bonded Project in which the Customer or Safeco has declared a default and Safeco has made an LOC Draw, then [the Elrod Plaintiffs] will pay or reimburse Champlain, in accordance with Sections C and D hereof, on or before 30 days after such Bonded Project is "Completed" ("Completed" is defined as either (I) acceptance by the customer, or (II) issuance of an occupancy permit by the applicable governmental authority); (b) if at any time, more than one Bonded Project is the subject of a notice of default … then the payment or reimbursement obligation of [the Elrod Plaintiffs] hereunder will not occur until 30 days after the last one of all such Bonded Projects are Completed; moreover, for purposes of calculating the amount to be paid or reimbursed [by the Elrod Plaintiffs], all LOC Draws will be aggregated and "netted," such that any credits or payments by the customer or Safeco in respect of any Bonded Project that serves to mitigate the amount of any LOC Draw will reduce such payment or reimbursement obligation of [the Elrod Plaitntiffs].

(App'x at 59-60.)

[64] Champlain argues that, even if Section D.2 is applicable, the proper result is the same remedy it suggests it was entitled to without Section D.2: the Elrod Plaintiffs must reimburse Champlain half the value of the $3.5 million substitute LOC, because there was evidence that all projects for which Safeco had used the LOC draw-down were completed. Failing that, Champlain argues that it is entitled to reimbursement of $232,416.05 plus cost and interests; this sum represents 50% of the amounts Safeco paid for two specific performance bond claims. The Elrod Plaintiffs contend that any reimbursement obligations are conditioned upon Champlain conforming to the process set forth in the

provisions of Section D.2 of the Agreement. By those terms, the Elrod Plaintiffs assert that Champlain proved, at most, one project completion, but that Champlain is not eligible for reimbursement even on that project because it failed to satisfy a condition precedent to payment by providing the Elrod Plaintiffs with a detailed accounting of the amounts paid by Safeco to the customer.

[65] We dispense first with the Elrod Plaintiffs' argument that Champlain was required to provide a detailed accounting as a condition precedent to payment. The Elrod Plaintiffs argue that clause (b) of Section D.2, which sets forth the process for reimbursement when multiple default claims have been made, requires a detailed accounting. They argue, "Champlain has never provided the Elrods with such an accounting, and it has not pursued or compelled Safeco to pursue any claims" in mitigation, and "[u]ntil such an accounting is performed, there is no reimbursement obligation under the contract." (Appellees' Br. at 43.) Yet our review of Section D.2 does not reveal any expressed requirement for an accounting. Indeed, Section D.2(b) does not indicate which party is obligated under the agreement to perform the calculation of the reimbursement amount. In the absence of an unambiguous expression of a condition precedent, we will not impose one—let alone one that would lead to forfeiture. *See Commonwealth*, 2006 WL 2567916, at *21; *Stoltz*, 1995 WL 654152, at *9. We accordingly reject the Elrod Plaintiffs' argument that failure to provide a detailed accounting requires Champlain's forfeiture of reimbursement rights under the Agreement.

[66] We turn now to two additional questions: for which type of bonds Champlain is entitled to reimbursement, and whether the completion provision of Section D.2 further limits Champlain's entitlement to reimbursement.

[67] Champlain argues—as it argued before the trial court—that it was entitled to reimbursement of the half of the draw-down from the substitute LOC. The Elrod Plaintiffs argued, and the trial court agreed, that the reimbursement provisions of Section D limited Champlain's possible recovery to only that portion of the LOC draw-down attributable to claims against performance bonds. This question is a threshold matter to considering the overall scope of action of Section D.2(a).

[68] The crux of this dispute lies in the bonds Safeco issued on JKE's behalf and in the Agreement's language in reference to Safeco-issued bonds. Three types of bonds were routinely used in JKE projects: material bonds, payment bonds, and performance bonds. At issue in the litigation were performance bonds (bonds ensuring JKE customers that projects would be completed) and payment bonds (bonds ensuring JKE's subcontractors of payment) that Safeco had issued on JKE's behalf, and against which JKE customers made claims when JKE was placed into bankruptcy.

[69] Against this background, Champlain argues (and argued before the trial court on summary judgment) that a Safeco draw against the LOC related to a performance bond default might have been necessary to trigger the

reimbursement provisions of Section D.[6] But upon triggering the reimbursement provisions, Champlain argues that the Agreement required 50% reimbursement of drawn-down substitute LOC funds without regard to the type of bond at issue. Champlain's argument points to two portions of the language in Section D: "In the event that (i) any JKE performance bond is in default … and (ii) results in Safeco drawing down on the Substitute LOC," and, later in Section D.2, "[t]o the extent … [a draw does not result in Safeco making a concurrent request from the Elrod Plaintiffs] … the Elrods and/or Elway (as applicable) will reimburse Champlain fifty percent (50%) of any and all amounts drawn down under the Substitute LOC." (App'x at 59-60.) Given the language, "any and all amounts drawn down under the Substitute LOC," Champlain asserts that the Elrod Plaintiffs were obligated to reimburse Champlain for half of any of the LOC draw-downs, so long as the other requirements in Section D.2 were met.

[70] The Elrod Plaintiffs argue otherwise, insisting that the use of "performance bonds" at the beginning of Section D and elsewhere in the Agreement limits its reimbursement obligations to, at most, only substitute LOC draw-down funds used to secure Safeco against performance bond claims. The trial court agreed, clarifying this point after this Court declined to hear Champlain's interlocutory

---

[6] Champlain sought reformation of the Agreement so that all references to "performance bonds" would be changed to reflect Champlain's insistence that the Agreement's terms applied to all bonds. Champlain does not argue that question on appeal, despite the Elrod Plaintiffs' insistence to the contrary.

appeal on the question, and reiterating that conclusion in the judgment Champlain now appeals.

[71] We think the trial court's construction of Section D, limiting the Agreement's reimbursement requirements only to performance bonds, was in error. Section D.2 does not, by its terms, condition the amount of reimbursement on the type of bond associated with the draw-down. That narrow construction does not comport with the overall intent of the parties, noted above, to provide equal exposure to risk of loss to both Champlain and the Elrod Plaintiffs. Section D makes a reimbursement obligation dependent upon JKE's default on a performance bond, in turn causing Safeco to draw down on the substitute LOC. But it does not limit the scope of the reimbursement obligation only to amounts drawn down due to performance bond defaults.

[72] As a final issue related to construction of the Agreement, we turn to the criteria for project completion. For a project to be deemed completed and thereby to create a reimbursement obligation on the part of the Elrod Plaintiffs, the Agreement in Section D.2(a) required "either (I) acceptance by the customer, or (II) issuance of an occupancy permit by the applicable governmental authority." (App'x at 60.) The trial court construed this provision to require that "Champlain must produce certificates of occupancy or acceptance to confirm completion … in order to trigger any liability." (App'x at 20.)

[73] We again conclude that the trial court erred in its construction of the agreement. There simply is no expressed requirement for certificates of

acceptance in the Agreement. The Agreement calls for *either* acceptance by the customer *or* an occupancy permit from an applicable governing authority.

[74] The trial court's misconstruction of this provision affected not only its legal reasoning, but also its fact-finding. The trial court found that only one project could be considered completed—the Rialto School Corporation project, for which Champlain produced a certificate of acceptance. The trial court concluded, however, that there was no acceptance of another project, at Michigan International Speedway, because though the customer had entered into a settlement agreement with respect to bond liability, "[n]o evidence was submitted that these repairs were ever completed or, if completed, when the completion was certified." (App'x at 20.) This finding, of course, was premised on the erroneous conclusion that proof of completion could come only through a certificate of occupancy or completion.

[75] The trial court's erroneous construction of these provisions resulted in litigation that limited the scope of the evidence presented at trial. Accordingly, upon remand, we instruct the trial court to conduct appropriate proceedings to permit the introduction of evidence so that the trial court may consider and rule on whether the various projects from which bond claims arose—related to either performance or payment bonds—were completed within the scope of the meaning of completion as set forth by the Agreement, and in conformance with the interpretation of the Agreement as set forth above.

[76] We note here an issue relevant to the determination of what amounts the Elrod Plaintiffs owe to Champlain: the amount of money retained by Safeco from its draw-down on the substitute LOC funds. Champlain argues that it is entitled to $1.75 million from the Elrod Plaintiffs, without regard to the possibility of recovering the remaining substitute LOC funds. Upon remand, we note that the trial court may or may not, depending upon the evidence presented, conclude that the funds retained by Safeco are to be offset against amounts owed by the Elrod Plaintiffs. Such an offset may be required to avoid the possibility of a double recovery in light of the *pro rata* reimbursement terms of the Agreement. Accordingly, we instruct the trial court take into account the Safeco-retained LOC funds in its decision upon remand.

## Implied Covenant of Good Faith and Fair Dealing

[77] We turn now to the final issue in Champlain's appeal, whether the trial court erred when it did not find that the Elrod Plaintiffs acted in a manner that violated the Agreement's implied covenant of good faith and fair dealing.

[78] As a threshold matter, we address Champlain's assertion that the trial court erred when it applied Indiana law related to the implied covenant of good faith and fair dealing, rather than Delaware law. Courts of the state in which a lawsuit is pending determine the applicable law; that is, choice-of-law rules are determined by the state in which the litigation occurs. *National Union Fire Ins. Co. of Pittsburgh, PA v. Standard Fusee Corp.*, 940 N.E.2d 810, 813 (Ind. 2010). "Indiana choice of law doctrine favors contractual stipulations as to governing

law." *Allen*, 766 N.E.2d at 1163. The Agreement includes a brief but clear statement, "This Agreement shall be governed by Delaware law." (App'x at 60.) We see no reason to disregard this facet of the parties' agreement. *See Allen*, 766 N.E.3d at 1163. Thus, we agree with Champlain that to the extent the trial court applied Indiana law in addressing Champlain's claim that the Elrod Plaintiffs breached the implied covenant of good faith and fair dealing, the trial court erred.

We agree with the Elrod Plaintiffs, however, that this error is harmless, because the trial court applied both Indiana *and* Delaware law, and because the trial court did not err in its application of Delaware law.

The Delaware Supreme Court has held that "the implied covenant [of good faith and fair dealing] attaches to every contract." *Dunlap v. State Farm Fire & Cas. Ins. Co.*, 878 A.2d 434, 441 (Del. 2005). "The covenant is best understood as a way of implying terms in the agreement, whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions." *Id.* (citations and quotations omitted). Thus, Delaware courts have "recognized the occasional necessity of implying contract terms to ensure the parties' reasonable expectations are fulfilled." *Id.* at 442 (citations and quotations omitted).

> Stated in its most general terms, the implied covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain. Thus, parties are liable for breaching the covenant when

their conduct frustrates the overarching purpose of the contract by taking advantage of their position to control implementation of the agreement's terms. This Court has recognized the occasional necessity of implying contract terms to ensure the parties' reasonable expectations are fulfilled. This quasi-reformation, however, should be [a] rare and fact-intensive exercise, governed solely by issues of compelling fairness. Only when it is clear from the writing that the contracting parties would have agreed to proscribe the act later complained of ... had they thought to negotiate with respect to that matter may a party invoke the covenant's protections.

*Id.* (citations and quotations omitted).

[81] Summarizing the purpose of the implied covenant, the *Dunlap* Court observed that "the implied covenant of good faith is the obligation to preserve the *spirit* of the bargain rather than the letter, the adherence to *substance* rather than form." *Id.* at 444 (citations and quotations omitted). The implied covenant of good faith and fair dealing will not permit courts to "infer language that contradicts a clear exercise of an express contractual right." *Nemec v. Shrader*, 991 A.2d 1120, 1127 (Del. 2010). Nevertheless, a party to an agreement may not act in a manner that does not further a legitimate interest of the party relying on the contract. *Id.*

[82] Champlain premises much of its argument that the trial court erred in concluding that the Elrod Plaintiffs did not breach the implied covenant of good faith and fair dealing on a construction of the Agreement we have already rejected: that the Elrod Plaintiffs were obligated to provide no less than $3.5 million in collateral, and that failure to do so obligates the Elrod Plaintiffs to

pay Champlain $3.5 million in damages. To the extent Champlain's argument rests on that construction—and much of it does—we find no error in the trial court's determination that the implied covenant of good faith and fair dealing was not breached.

[83] Moreover, as the *Dunlap* Court observed, "[o]nly when it is clear from the writing that the contracting parties would have agreed to proscribe the act later complained of … had they thought to negotiate with respect to that matter may a party invoke the covenant's protections." *Id.* Yet Champlain's insistence that it and the Elrod Plaintiffs would have agreed to proscribe Dale's efforts to negotiate less or no additional collateral is not at all clear from the face of the Agreement. And, contrary to Champlain's assertion that Dale's negotiation tactics were solely self-serving, the language of the Agreement itself suggests that a reduction in the total collateral requirement would have furthered both parties' legitimate interests. *See Nemec*, 991 A.2d at 1127 (recognizing that challenged conduct may not breach the implied covenant if it advances the legitimate interest of a relying counter-party). Under the *pro rata* and *pari passu* provisions, less total collateral exposed the Elrod Plaintiffs to a reduced level of exposure to reimbursement risk. Under the provision requiring payment of a fee for use of collateral, JKE would be required to pay less money to the Elrod Plaintiffs, preserving more capital in the company and thereby mitigating *both* parties' risks as shareholders.

[84] Finally, we note that Champlain argues that by organizing a corporation while JKE was collapsing, the Elrod Plaintiffs were acting contrary to Champlain's

interests and were preparing to take over JKE's business. The testimony at trial, which the trial court was entitled to credit, was that the corporation created by the Elrod Plaintiffs, MSC, was intended to serve as a holding company for the assets the Elrod Plaintiffs purchased and then leased back to JKE during the restructuring transaction. The company was also ultimately used to take possession of those assets after Champlain placed JKE into bankruptcy. To the extent Champlain simply insists that the Elrod Plaintiffs were disloyal to JKE and Champlain, the trial court was entitled to conclude differently based upon weight given to evidence from Jeffrey and Dale indicating that they and Mary Ann used personal assets to help preserve JKE and to ensure payment of wages to employees whose paychecks from JKE were dishonored. And to the extent Champlain argues that the formation of MSC had another purpose, or that the Elrod Plaintiffs were otherwise disloyal in a manner that breached the implied covenant of good faith and fair dealing, we decline the invitation to reweigh evidence.

# Conclusion

[85] The trial court did not err when it found that the Elrod Plaintiffs did not breach the Agreement when they did not 1) unilaterally make $3.5 million available as collateral for Safeco's underwriting of future bonds, or 2) replace Champlain's funds in the substitute LOC. The trial court erred as a matter of law in several aspects of its construction of various provisions of the Agreement, namely, reimbursement of Safeco draw-downs from the substitute LOC and the sharing

of risk as to both payment and performance bonds. The trial court did not err when it found that the Elrod Plaintiffs did not breach the Agreement's implied covenant of good faith and fair dealing.

[86] Because the trial court's conduct of the trial was premised upon its misconstruction of the Agreement's reimbursement provisions, thereby limiting the evidence introduced and the trial court's consideration of that evidence, we reverse the judgment solely on the question of reimbursement and remand for further proceedings consistent with our holding today.

[87] Affirmed in part, reversed in part, and remanded.

Bradford, J., and Altice, J., concur.