

FILED

Oct 26 2018, 10:00 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Richard A. Kempf
Paul T. Deignan
Thomas F. O'Gara
TAFT STETTINIUS & HOLLISTER LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Jenny R. Buchheit
Eileen P.H. Moore
Adam D. Zacher
ICE MILLER LLP
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Elway Company, LLP, Dale K. Elrod, Jeffrey L. Elrod, and Mary Ann Waymire, | October 26, 2018 |
| *Appellants-Plaintiffs/Counterclaim Defendants,* | Court of Appeals Case No. 18A-CC-443 |
| | Appeal from the Morgan Superior Court |
| v. | The Honorable Brian H. Williams, Judge |
| Champlain Capital Partners, L.P., | Trial Court Cause No. 55D02-1105-CC-1032 |
| *Appellee-Defendant/Counterclaim Plaintiff.* | |

**Bailey, Judge.**

# Case Summary

Elway Company, LLP, ("Elway Company") and siblings Dale K. Elrod ("Dale"), Jeffrey L. Elrod ("Jeffrey"), and Mary Ann Waymire ("Mary Ann") (collectively and at times taken together with Elway Company, "the Elrod Plaintiffs") appeal a grant of summary judgment in favor of Champlain Capital Partners, L.P. ("Champlain") upon remand from an appeal of prior litigation related to eight construction projects ("the Bonded Projects") covered by a Bonding Collateral Agreement ("the Agreement") executed by the Elrod Plaintiffs and Safeco Surety ("Safeco"), now Liberty Mutual Insurance Company. We remand "to permit the introduction of evidence so that the trial court may consider and rule on whether the various projects from which bond claims arose … were completed within the scope of the meaning of completion as set forth by the Agreement." *Champlain Capital Partners, L.P. v. Elway Co., LLP*, 58 N.E.3d 180, 201 (Ind. Ct. App. 2016), *trans. denied* ("*Champlain I*").

# Issues

The Elrod Plaintiffs present for our review three consolidated and restated issues:

> I.   Whether the law-of-the-case doctrine should be discarded under the circumstances of this case;

> II.  Whether the trial court improperly granted summary judgment upon its determination that all bonded projects

were complete, thereby triggering the reimbursement
provision of the Agreement; and

III.   Whether prejudgment interest was properly awarded.[1]

# Facts and Procedural History

In 2004, Dale, Jeffrey, and Mary Ann were majority shareholders in the John K. Elrod Company ("JKE"), a business involved in construction of stadium seating and safety barriers. *See Champlain I.* In 2005, Champlain, a Delaware investment firm focused on small business acquisition and growth, acquired JKE in a leveraged buyout. The Elrod siblings were then minority shareholders.

Before and after the leveraged buyout, JKE obtained its performance, payment, and supply bonds from Safeco.[2] After the buyout, Safeco determined that it would no longer accept personal indemnities from a family member and instead demanded $3.5 million collateral in the form of an irrevocable letter of credit ("ILOC"). *See id.* The Elrod siblings agreed to loan $3.5 million to JKE from the proceeds of the sale of the business to Champlain. The ILOC was placed with Fifth Third Bank.

---

[1] Because we remand for a predicate factual determination, we do not address the third issue.

[2] Two types were involved in the parties' dispute: performance bonds (ensuring JKE customers of project completion) and payment bonds (ensuring JKE's subcontractors of payment).

[5] JKE's finances became unstable and Fifth Third Bank moved JKE's loans to a workout division in anticipation of foreclosing on the loans. *See id.* at 186. During July and August of 2006, the Elrod Plaintiffs, Champlain, JKE's lenders, and other minority shareholders in JKE negotiated a transaction to restructure JKE's finances. The Elrod Plaintiffs contributed several million dollars in capital to JKE, and Elway Corporation[3] acquired, with the Elrod funds, certain JKE assets, thereby contributing $4.7 million to JKE. Safeco released the $3.5 million ILOC, replaceable by a $3.5 million ILOC using capital from Champlain ("the Substitute LOC").

[6] With JKE on more solid financial footing, its goal was to expand its business to include larger jobs. For this, JKE needed to increase its bonding limits with Safeco. To address the availability of collateral so that Safeco would increase JKE's bonding limits, the restructuring transaction included the Agreement. The Agreement required Champlain to provide the Substitute LOC in a value not to exceed $3.5 million and this had been done before the Agreement was executed. The Agreement also required the Elrod Plaintiffs to provide collateral not to exceed $3.5 million to Safeco, but the terms did not include a time limit. *See id.* at 186-87.

[7] By mid-October of 2006, JKE's cash flow situation was dire, and it defaulted on lease payments to Elway Company. On October 16, 2006, Champlain, as the

---

[3] The Elway Corporation is a limited liability corporation owned by Dale, Jeffrey, and Mary Ann.

majority shareholder, placed JKE into liquidation bankruptcy proceedings. JKE ceased performance on the Bonded Projects. Consequently, Safeco acted to draw down the funds in the Substitute LOC. *See id.* at 188. Safeco placed the $3.5 million into a bank account to use for paying claims against bonds Safeco had issued on JKE's behalf. Safeco used all but $591,023.98 of funds from the Substitute LOC to reimburse itself for claims against JKE bonds and pay expenses associated with bond claims and litigation. Eight construction project owners had potential bond claims: Michigan International Speedway ("MIS"), Darlington Raceway, Watkins Glen, Maine Township High School, Kewanee School, Rialto School, Speedway Bid, and Speedway Grandstand.

[8] Champlain demanded reimbursement from the Elrod Plaintiffs for the Safeco draw-down of funds, but the Elrod Plaintiffs disputed the demands. On December 22, 2010, the Elrod Plaintiffs filed a declaratory judgment complaint, alleging that their obligations under the Agreement were limited to payments made from the Substitute LOC for defaults on only performance bonds. Champlain filed a counterclaim, alleging that the Elrod Plaintiffs had breached the terms of the Agreement by failing to post an additional $3.5 million in collateral and by withholding reimbursement for claims paid related to the Bonded Projects. In addition to alleging breach of contract, Champlain

asserted claims of unjust enrichment and breach of an implied covenant of good faith and fair dealing.[4]

[9] The parties filed cross-motions for summary judgment, and the trial court granted partial summary judgment to the Elrod Plaintiffs, concluding that the Agreement applied only to performance bonds and that an unjust enrichment claim could not proceed when the rights of the parties were controlled by a contract. Champlain requested reformation of the Agreement on grounds of scrivener error or mutual mistake, but the trial court declined to reform the Agreement.[5] A bench trial proceeded on the claims of breach of contract and breach of an implied covenant of good faith and fair dealing. On September 15, 2015, the trial court entered judgment entirely in favor of the Elrod Plaintiffs. *See id.* at 189. Champlain appealed.

[10] On appeal, this Court first addressed the trial court's findings and conclusions related to the Elrod Plaintiffs' failure to post an additional $3.5 million in collateral. We "conclude[d] that the Agreement required that the Elrod Plaintiffs add to the bonding collateral only upon Safeco's demand" and "[t]he Agreement did not by its terms require the Elrod Plaintiffs to make $3.5 million available to Champlain or JKE." *Id.* at 194. Moreover, the Agreement did not

---

[4] The Agreement included a choice-of-law clause providing that the Agreement should be governed under Delaware law.

[5] Champlain asked that the Agreement be reformed to refer to all surety bonds as opposed to performance bonds and refer to $3.5 million as a fixed amount rather than a cap.

"provide that Safeco's refusal to continue to underwrite JKE's bonds amounted to a reduction of collateral that would first inure to Champlain's benefit or otherwise require that the Elrod Plaintiffs replace the Substitute LOC with a $3.5 million contribution of their own." *Id.* As such, the trial court did not err when it found no breach on this basis.[6]

[11] Turning to whether the Agreement established a reimbursement obligation on the part of the Elrod Plaintiffs, we quoted the relevant portion of the Agreement ("the Reimbursement Provision"):

> Notwithstanding any documentation to the contrary setting forth the legal effect, rights, obligations, and priority of Safeco as against (i) Champlain under the Substitute LOC and (ii) [the Elrod Plaintiffs] under the Elrod/Elway Guaranty, but subject to section D.2 below, both Champlain and [the Elrod Plaintiffs] agree that they will share and incur ultimate liability and financial out-of-pocket exposure to Safeco on a *pro rata* and *pari passu* basis with respect to the $7 Million aggregate Safeco Collateral Commitment, which is being made under the Substitute LOC and the Elrod/Elway Guaranty.

(App'x at 59.)[7]

---

[6] We also affirmed the trial court's conclusion that there was no breach by the Elrod Plaintiffs of the Agreement's implied covenant of good faith and fair dealing.

[7] *Pro rata* terms require proportional allocation, "according to an exact rate, measure, or interest." *Black's Law Dictionary* 1415 (10th ed. 2014). *Pari passu* terms require proportionality of pace, that is, compensation "without preference." *Id.* at 1290.

[12]     Examining the Agreement as a whole, we concluded that the parties' intent was "to ensure that the risk of loss of funds to Safeco bond claims would not rest solely with Champlain." *Champlain*, 58 N.E.3d at 196. Having determined that the trial court erred in concluding that Champlain was not entitled to reimbursement unless the Elrod Plaintiffs had also contributed collateral, we turned to consider the extent of the reimbursement obligation. The parties disputed the proper interpretation of language in Section D.2 of the Agreement, specifically:

> To the extent that an LOC Draw does not result in a commensurate and concurrent request from Safeco for the Elrods and/or Elway to fund under the Elrod/Elway Guaranty, the Elrods and/or Elway (as applicable) will reimburse Champlain fifty percent (50%) of any and all amounts drawn down … according to the following procedure: (a) if at any time, there is only one Bonded Project in which the Customer or Safeco has declared a default and Safeco has made an LOC Draw, then [the Elrod Plaintiffs] will pay or reimburse Champlain, in accordance with Sections C and D hereof, on or before 30 days after such Bonded Project is "Completed." ("Completed" is defined as either (I) acceptance by the customer, or (II) issuance of an occupancy permit by the applicable governmental authority); (b) if at any time, more than one Bonded Project is the subject of a notice of default .. then the payment or reimbursement obligation of [the Elrod Plaintiffs] hereunder will not occur until 30 days after the last one of all such Bonded Projects are Completed; moreover, for purposes of calculating the amount to be paid or reimbursed [by the Elrod Plaintiffs], all LOC Draws will be aggregated and "netted," such that any credits or payments by the customer or Safeco in respect of any Bonded Project that serves to mitigate the amount of any LOC Draw will reduce such payment or reimbursement obligation of [the Elrod Plaintiffs].

(App'x at 59-60). We concluded that the Reimbursement Provision did not include an express requirement for an accounting; thus, Champlain did not forfeit reimbursement rights for failure to provide a detailed accounting. *Champlain*, 58 N.E.3d at 199. We also concluded that the Reimbursement Provision "does not limit the scope of the reimbursement obligation only to amounts drawn down due to performance bond defaults." *Id.* at 200.

[13] We then examined the Agreement's criteria for project completion and ultimately reversed solely on the matter of reimbursement and remanded to permit the introduction of evidence of completion:[8]

> For a project to be deemed completed and thereby to create a reimbursement obligation on the part of the Elrod Plaintiffs, the Agreement in Section D.2(a) required "either (I) acceptance by the customer, or (II) issuance of an occupancy permit by the applicable governmental authority." (App'x at 60.) The trial court construed this provision to require that "Champlain must produce certificates of occupancy or acceptance to confirm completion … in order to trigger any liability." (App'x at 20.)

> We again conclude that the trial court erred in its construction of the agreement. There simply is no expressed requirement for certificates of acceptance in the Agreement. The Agreement calls for *either* acceptance by the customer *or* an occupancy permit from an applicable governing authority.

---

[8] We also instructed the trial court to consider the Safeco-retained LOC funds in its decision on remand. *Id.* at 201.

The trial court's misconstruction of this provision affected not only its legal reasoning, but also its fact-finding. The trial court found that only one project could be considered completed – the Rialto School Corporation project, for which Champlain produced a certificate of acceptance. The trial court concluded, however, that there was no acceptance of another project, at Michigan International Speedway, because though the customer had entered into a settlement agreement with respect to bond liability, "[n]o evidence was submitted that these repairs were ever completed or, if completed, when the completion was certified." (App'x at 20.) This finding, of course, was premised on the erroneous conclusion that proof of completion could come only through a certificate of occupancy or completion.

The trial court's erroneous construction of these provisions resulted in litigation that limited the scope of the evidence presented at trial. Accordingly, upon remand, we instruct the trial court to conduct appropriate proceedings to permit the introduction of evidence so that the trial court may consider and rule on whether the various projects from which bond claims arose – related to either performance or payment bonds – were completed within the scope of the meaning of completion as set forth by the Agreement, and in conformance with the interpretation of the Agreement set forth above.

*Id.* at 200-201. The Elrod Plaintiffs filed a petition for rehearing, which was denied on October 4, 2016. On January 19, 2017, the Indiana Supreme Court denied a petition for transfer. On January 26, 2017, the opinion of this Court was certified, and the matter was remanded to the trial court. Anticipating no further bond claims, Safeco conditionally returned $554,537.00 to Champlain.

[14] On September 22, 2017, Champlain filed a motion for summary judgment. After some discovery disputes and extensions of time in which to conduct

discovery, the parties appeared on December 5, 2017 for a hearing on the pending motion for summary judgment and a pending motion to strike, which challenged the admissibility of an affidavit attached to the motion for summary judgment.

[15] Champlain argued that, "for at least the past seven years," both parties have "had in their possession evidence from Safeco demonstrating that the eight bonded projects at issue are completed." (S.J. Tr. at 6.) Champlain designated the deposition testimony of Safeco's corporate representative, Stacy Hipsak-Goetz ("Goetz"). That deposition, in its entirety, had been admitted at the bench trial as Stipulated Trial Exhibit 1. Therein, Goetz had testified that she had personal knowledge of the completion of the Kewanee Project, Maine Township Project, Watkins Glen Project, Darlington Raceway Project, Iowa Speedway Bid Project, and the Iowa Speedway Grandstand Project. However, because the trial court had at the bench trial focused upon only performance bond claims, the findings of fact, conclusions of law, and judgment had specifically addressed evidence of completion of only the Rialto and MIS projects.

[16] With the benefit of this Court's opinion in *Champlain I*, Champlain asked the trial court to consider the deposition testimony as prima facie evidence of the completion of most Bonded Projects. The trial court had made a factual finding in its prior judgment that the Rialto School Corporation project had been completed within the scope of the Agreement, because a certificate of occupancy had been produced at trial. *See Champlain I*, 58 N.E.3d at 201. As

for the MIS project, Champlain argued that this Court had, in the prior appeal, determined that project "to be completed." (S.J. Hearing Tr. at 6.)

[17] The Elrod Plaintiffs responded, "that is not what the Court of Appeals said," (Tr. at 18), and argued "there was no ruling by the Court of Appeals that the settlement agreement substituted for acceptance." *Id.* at 19. The Elrod Plaintiffs further asserted that the MIS/JKE contract had been terminated in 2006, Goetz had testified in her deposition that she lacked knowledge of completion, and Champlain had failed to obtain evidence of completion. The Elrod Plaintiffs asked that the matter proceed to trial.

[18] On February 21, 2018, the trial court granted Champlain's motion for summary judgment. In its order on summary judgment, the trial court treated each of the Bonded Projects as completed, triggering the reimbursement obligation. The trial court assigned completion dates of January 3, 2008 for the Rialto Project, September 1, 2006 for the Kewanee Project, November 19, 2006 for the Watkins Glen Project, April 25, 2006 for the Darlington Raceway Project, and September of 2006 for the Iowa Speedway Bid Package and the Iowa Speedway Grandstand Project. As to the MIS Project, the trial court concluded that this Court had "by implication" expressed a belief "that Michigan International

Speedway had accepted the Project" and that the law of the case prevented re-examination. (Appealed Order at 11.)[9]

[19] Judgment was entered against the Elway Company, Dale, Jeffrey, and Mary Ann, jointly and severally, in the amount of $1,472,731.30. The trial court concluded that the final bonded project was completed no later than March 26, 2013, when Safeco settled the claim related to the MIS Project, and awarded prejudgment interest calculable from thirty days later, April 25, 2013. This appeal ensued.

# Discussion and Decision

## Law of the Case

[20] The Elrod Plaintiffs ask that we revisit the determinations that the Agreement was intended to allocate the risk of loss between parties and that the Agreement applies to both performance and payment bonds. Champlain responds that,

---

[9] The trial court also stated that "there was a Certificate of Occupancy issued for the Michigan International Speedway Project" and "[t]he fact that it was issued before the Bonding Collateral Agreement was signed or before Michigan International Speedway made a claim on the performance bond is immaterial to the determination of whether the Project was completed." (Appealed Order at 11.) The judgment in the bench trial states: "The parties stipulated that on June 13, 2015, Champlain first produced to the Elrods (via counsel) … a certificate of occupancy *from MIS* dated June 13, 2005, which was over one year before the execution of the Bonding Collateral Agreement." (Judgment, para. 106.) (emphasis added). The trial court may have intended to reference the year of 2006, as opposed to 2005, consistent with Goetz's deposition testimony. However, the trial court did not assign a completion date based upon the Certificate of Occupancy.

under the law-of-the-case doctrine, the intent and scope of the Agreement will not be relitigated.

[21] The law-of-the-case doctrine provides that an appellate court's determination of a legal issue binds the trial court and the appellate court in any subsequent appeal involving the same case and substantially the same facts. *Rapkin Grp., Inc. v. Cardinal Ventures*, 29 N.E.3d 752, 758 n.6 (Ind. Ct. App. 2015). The law-of-the-case doctrine is based upon the sound public policy that once an issue has been litigated and decided, that should be the end of the matter. *Id.* Unlike the doctrine of *res judicata*, the law-of-the-case is a discretionary tool. *Id.* The law-of-the-case doctrine has been found to be inapplicable when additional information distinguishes the case factually from the case decided in the first appeal. *Id.* Also, to invoke the law-of-the-case doctrine, "the matters decided in the prior appeal must clearly appear to be the only possible construction of the opinion." *Travelers Cas. & Sur. Co. v. Maplehurst Farms, Inc.*, 18 N.E.3d 311, 315 (Ind. Ct. App. 2014) (quoting *Riggs v. Burrell*, 619 N.E.2d 562, 564 (Ind. 1993)), *trans. denied*.

[22] In the prior appeal, we unquestionably decided that the Agreement allocated risk between the parties and that the Agreement's reimbursement requirement applied to payment bonds as well as performance bonds. That holding is unambiguous, with only one possible construction. We determined that the trial court had erroneously construed one provision that limited the scope of the evidence presented at trial. *Champlain I*, 58 N.E.3d at 201. We remanded to permit the introduction of evidence "so that the trial court may consider and

rule on whether the various projects from which bond claims arose – related to either performance or payment bonds – were completed within the scope of the meaning of completion as set forth by the Agreement, and in conformance with the interpretation of the Agreement as set forth above." *Id.*

[23] The Elrod Plaintiffs claim that they presented new evidence relative to the parties' understanding of contract terms. "[W]here new facts are elicited upon remand that materially affect the questions at issue, the court upon remand may apply the law to the new facts as subsequently found." *In re Change to Established Water Level of Lake of Woods in Marshall Cty.*, 822 N.E.2d 1032, 1044 (Ind. Ct. App. 2005), *trans. denied*.

[24] However, the Elrod Plaintiffs have essentially renewed the legal arguments rejected by this Court in the first appeal and on rehearing. The trial court was not required, on remand, to elicit facts necessary to interpret the Agreement. Rather, the trial court was instructed to act in conformance with the interpretation of the Agreement as set forth in the opinion. Because we remanded only to permit the introduction of evidence of completion of Bonded Projects, if indeed the Elrod Plaintiffs presented new evidence of contractual intent, it was not relevant to an issue for the trial court upon remand. We discern no basis upon which to find the law-of-the-case inapplicable.

# Grant of Summary Judgment

[25] Upon review of a trial court's grant or denial of summary judgment, we apply a well-settled standard:

We review summary judgment de novo, applying the same standard as the trial court: Drawing all reasonable inferences in favor of … the non-moving parties, summary judgment is appropriate if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if its resolution would affect the outcome of the case, and an issue is genuine if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences. The initial burden is on the summary-judgment movant to demonstrate [ ] the absence of any genuine issue of fact as to a determinative issue, at which point the burden shifts to the non-movant to come forward with contrary evidence showing an issue for the trier of fact. And [a]lthough the non-moving party has the burden on appeal of persuading us that the grant of summary judgment was erroneous, we carefully assess the trial court's decision to ensure that he was not improperly denied his day in court.

*Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014) (citations omitted).

[26]     In *Champlain I*, we acknowledged that the trial court, as the fact-finder in a bench trial, was to determine whether each of the Bonded Projects had been completed. As of the first appeal, this fact-finding had been made – by the trial court – as to one bonded project, Rialto. We remanded and "instruct[ed] the trial court to conduct appropriate proceedings to permit the introduction of evidence so that the trial court may consider and rule on whether the various projects … were completed."

[27]     The trial court did not conduct an evidentiary hearing, but rather considered designated materials. In conducting our review of the designated materials, it is

undisputed that Safeco considered each of the bond claims resolved. Safeco had internally classified each of the Bonded Projects as completed or tendered.[10]

[28] With respect to the MIS project, Goetz had described it as "a claim resolved" in 2013. (Appellee's App. Vol. II, pg. 103.) She provided some history of the claim handling. After JKE filed bankruptcy and ceased work on the Bonded Projects, MIS contacted Safeco claiming that JKE's work was defective and requesting that Safeco arrange for repairs. Eventually, Safeco and MIS entered into a settlement agreement regarding repair. Safeco agreed that MIS could retain the balance it owed on the construction contract and Safeco paid MIS an additional $200,000.00. MIS executed a release. Safeco did not monitor whether repairs were performed. Indeed, it is also undisputed that Safeco's representative did not know the ultimate outcome of the MIS Project. Specifically, Goetz had "no idea what they did with our money." (Appellee's App. Vol. II, pg. 105).

[29] Relevant evidence upon remand would be that which would permit the trial court to factually determine completion as defined by the Agreement. The Agreement does not define completion as, for example, cessation of work, resolution of bond claims, consent of surety, a certificate of substantial completion, or surety's classification. Under the Agreement, completion is demonstrated by acceptance or a certificate of occupancy by a governmental

---

[10] Goetz explained that Safeco considered a project tendered if it was turned over to a new contractor for completion or repairs.

authority. It is axiomatic that a certificate of occupancy must relate to one of the Bonded Projects to fall within the purview of the Agreement.

[30] In its summary judgment order, the trial court stated that this Court had, in *Champlain I*, "by implication" expressed this Court's "belief" that "MIS had accepted the Project." (Appealed Order at 11.) We did not, and could not properly find that MIS, the customer, accepted the work performed. An appellate court does not engage in factfinding. *See Woods v. State*, 701 N.E.2d 1208, 1216 (Ind. 1998) (observing that a reviewing court does not have reasonable ability to engage in fact-finding or take new evidence).

[31] In Paragraph 42, the summary judgment order references the Release between MIS and Safeco, to which Champlain and the Elrod Plaintiffs were not parties.[11] This Release provides in part: "prior to the completion of the Prime Contract, MIS alleged certain leakage and water damage which MIS contended was the result of Elrod's breach of the Prime Contract." (App. Vol. V, pg. 127.) The Release further stated that "Elrod's Prime Contract was terminated on or about October 25, 2006." *See id.*

[32] The "Prime Contract" would appear to be, considering Goetz's deposition testimony and the language of the Release, the final contract between JKE and

---

[11] The Release indicates that the Parties [Michigan International Speedway, also "MIS", and Safeco] "desire to compromise and settle the claims and disputes between them." (App. Vol. V, pg. 127.) Safeco released MIS from liability to pay the contract balance. MIS released Safeco from claims of any kind and assigned to Safeco its "claims against Elrod." *See id.* at pg. 129.

MIS. However, it was not the only contract between JKE and MIS. Although the summary judgment order states in Paragraph 41 that a Certificate of Occupancy was issued for the MIS project, and the trial court considered it immaterial that the issuance of that certificate predated the Agreement, the trial court did not assign a completion date for the MIS project based upon that certificate of occupancy, as it did with some other projects. Nor can we do so. Even if we assume that the Certificate of Occupancy was issued by the appropriate governmental authority, without further evidentiary development, the question remains as to whether it referenced work that was within the scope of the Agreement. And even if the facts in designated materials are undisputed, summary judgment is inappropriate if there is a good faith dispute as to the inferences to be drawn from those facts. *Long v. Durnil*, 697 N.E.2d 100, 104 (Ind. Ct. App. 1998), *trans. denied.*

[33] The existence of the certificate does not give rise to a single inference. Designated materials – specifically, the deposition testimony of Dennis Leary and Goetz – indicate that more than one bond had been issued relative to MIS and that MIS had owned twelve to fourteen racetracks where JKE had performed work. We cannot say, as a matter of law, that the pre-Agreement certificate, whatever its origin, without dispute satisfied the contractual requirement of completion under the Agreement. Nor do we conclude, as a matter of law, that there was customer acceptance of the MIS Bonded Project. We conclude that the trial court improperly granted summary judgment to Champlain.

# Conclusion

[34] The Elrod Plaintiffs have provided no basis for disregarding the law of the case. However, because we conclude that the designated materials do not establish that each of the Bonded Projects was completed "within the scope of the meaning of completion as set forth by the Agreement," *Champlain I* at 201, we remand to permit the introduction of evidence.

[35] Reversed and remanded.

Bradford, J., and Altice, J., concur.